* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence or rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms, with minor modifications, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. N.C. Insurance Guaranty Association is the carrier on the risk because the original carrier, Reciprocal Insurance, is financially insolvent.
3. An employee-employer relationship existed between the parties at all relevant times.
4. The plaintiff sustained a compensable low back injury on December 20, 2002. The plaintiff received temporary total disability benefits from December 21, 2002, until about January 17, 2003, at which time she returned to light duty work. Defendants admit plaintiff suffered a compensable low back injury, but deny that plaintiff is entitled to any benefits in addition to those already paid. Defendants deny that the plaintiff suffered a compensable cervical injury.
5. Plaintiff's average weekly wage is $457.00, which yields a compensation rate of $304.68 per week.
 * * * * * * * * * * *
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 42 years of age. She had earned a high school diploma and had worked as a licensed practical nurse since 1981. In April 2002, she began working for defendant-employer.
2. Prior to December 20, 2002, plaintiff was treated for a variety of medical conditions, including migraines, depression, hypothyroidism, pollyarthragia, fibromyalgia, hypertension, high cholesterol, asthma, insomnia, and back pain.
3. On December 20, 2002, plaintiff suffered a compensable injury by accident to her low back when lifting a combative patient.
4. The next morning, plaintiff woke up with low back pain. This pain was sharper and more intense than her previous low back pain. She sought treatment at St. Luke's Hospital. She was diagnosed with a back strain and given conservative treatment. On December 24, 2002, plaintiff presented to her family physician, Dr. Jeffrey K. Viar, a licensed osteopathic physician, with tenderness at her left sacroilliac region of her lower spine but no radiation down into her feet. Dr. Viar diagnosed a low back sprain and recommended physical therapy as well as anti-inflammatory therapy.
5. Plaintiff subsequently went through physical therapy and continued conservative treatment. As of December 31, 2002, Dr. Viar noted that plaintiff's physical therapy had been helping, that she had fewer muscle spasms, and that her range of motion was improved. He released her to return to light duty work.
6. At the hearing before the Deputy Commissioner, plaintiff testified that on or about January 16, 2003, she returned to light duty work consistent with Dr. Viar's restrictions. At work, plaintiff primarily prepared notes and dispensed medications. She worked reduced hours and was paid temporary partial benefits.
7. Plaintiff had taken Duragesic 150 mg prior to her work injury for her fybromyalgia. On January 28, 2003, Dr. Viar increased her Duragesic to 175 mg three times a day. Dr. Viar added Neurontin 300 mg to her regimen on January 3, 2003. On January 9, 2003, the Neurontin was increased to 600mg. On January 28, 2003, Dr. Viar increased the Neurontin to 800 mg. Lortab was prescribed on February 7, 2003, and a TENS unit was prescribed February 12, 2003. Five mg of Valium was prescribed on January 29, 2003, and that was doubled to 10 mg on March 12, 2003. The Full Commission finds that plaintiff's steady increase in pain medications reflects her heightened pain resulting from her work injury.
8. Dr. Viar gave plaintiff a full duty release dated February 18, 2003. However, she testified at the hearing before the Deputy Commissioner that she was surprised that Dr. Viar had released her since she still had significant low back pain. Plaintiff reported to Sharon Summey, a nurse manager for defendant-employer, that she was still on light duty and would be on light duty for another two weeks.
9. Beginning in October 2002, Dr. Gowin, a rheumatologist, began treating plaintiff for fibromyalgia. Plaintiff's first visit with Dr. Gowin after December 20, 2002, was on March 4, 2003. Dr. Gowin noted that plaintiff had tenderness around the left sacroilliac joint and felt that she might have radicular leg pain. Dr. Gowin recommended that plaintiff obtain a lumbar spine MRI and gave her a return appointment in six months.
10. On March 6, 2003, Sharon Summey notified plaintiff that she was being terminated. The reasons cited for termination were misrepresentation of facts, dishonesty and fraud for claiming she was on light duty when she was actually released to full duty.
11. In his deposition testimony, Dr. Viar opined that plaintiff was medically justified in not returning to her job after she was terminated and felt that plaintiff could not do the patient care work without further aggravating her back.
12. On March 12, 2003, plaintiff presented to Dr. Viar. Although plaintiff felt that her fibromyalgia was flaring up, that she was having pain in her leg, and that she was starting to get pain in her neck, plaintiff reported to Dr. Viar that she was able to continue supporting her family without much dysfunction.
13. At roughly the same time, plaintiff stopped attending classes to become a registered nurse, conducted a small-scale job hunt, and learned that her claim for unemployment insurance benefits had been denied.
14. On April 1, 2003, plaintiff presented to both Dr. Gowin and Dr. Viar. That same day, Dr. Viar reported, "she is having a terrible amount of pain." Plaintiff reported to Dr. Gowin that she had increased pain all over, that she felt much worse and that she specifically had increased neck and back pain. She also stated that she felt exhausted all the time and that she was unable to work due to exhaustion. In her deposition testimony of January 13, 2005, Dr. Gowin opined that plaintiff was unable to perform her regular duties as an LPN without restriction as of April 1, 2003, and as of the date of the deposition, remained unable to work.
15. On or about April 28, 2003, plaintiff obtained the lumbar MRI, which showed degenerative disk disease at L4-5 and L5-S1, more severe at L5-S1; a left-sided annular tear at L4-5; moderate thickening of the facet joints causing mild lateral stenosis, more on the left than on the right; and an acute central disk herniation at L5-SI.
16. On May 1, 2003, plaintiff again presented to Dr. Viar. She told him that her pain level was much improved from "the crisis" she was in previously. Dr. Viar did not indicate that plaintiff was having any problems with her back at this time but noted that plaintiff was tender in several areas and that an increase in her Valium prescription seemed to be helping. On May 20, 2003, plaintiff followed up again with Dr. Viar with no report of ongoing back problems.
17. On June 26, 2003, plaintiff presented to Dr. Viar complaining of contractures in her arms and that she could not move her arms or legs without screaming with pain. Dr. Viar was alarmed enough by her condition that he felt she needed an MRI of her brain. Before that test was completed, plaintiff sought treatment with Dr. Gowin. She indicated that she woke up with leg and arm numbness two weeks earlier. Dr. Gowin felt that the arm numbness was new at that point and that an MRI of the neck was necessary, which showed spinal stenosis at C3-4, and C4-5.
18. Beginning in August 2003, plaintiff sought treatment with a neurosurgeon, Dr. Charles Haworth with Duke University Neurosurgical Associates. After reviewing plaintiff's history, including the MRI's, Dr. Haworth felt that plaintiff had an immediate need for neck surgery. Therefore, on November 18, 2003, Dr. Haworth performed laminoplasties on her neck.
19. Subsequently, plaintiff again complained of low back pain, and after further testing, Dr. Haworth noted that she had annular tears at both L4-5 and L5-S1. On April 6, 2004, he performed a minimally invasive microdiskectomy at L4-5 and L5-S1.
20. On May 14, 2004, Dr. Haworth discharged plaintiff from his care.
21. In August 2004, plaintiff began treatment with Dr. Mark Moody, an orthopedic surgeon. Dr. Moody ordered MRI scans that revealed a small recurrent herniation at left L4-5 and degenerative disk disease from levels L2 through S1. He also noted that there was no severe lumbar spinal stenosis. He recommended that plaintiff seek treatment through Spine Carolina's rehabilitation services and did not recommend any further surgery.
22. In his deposition testimony, Dr. Haworth opined that it was possible plaintiff's work injury could have caused some degree of distention of the L5-S1 disk but that it was hard to necessarily match that up to any specific neurological findings or to plaintiff's chief complaints other than just back pain. He would expect that the symptoms from a traumatically induced herniated disk should appear immediately and should not be delayed over time. He also confirmed that pain from a herniated disk can wax and wane but should be a gradual process, not just an on and off process. He also felt that when the pain in such a situation worsens then something has changed to cause the disk protrusion to become worse. Furthermore, Dr. Haworth opined that plaintiff probably could not have returned to work while under his care, but that he expected her ultimately to be able to return to her former type of work.
23. Both Dr. Viar and Dr. Haworth testified that it was possible that plaintiff reached maximum medical improvement as to her low back strain as of February 18, 2003; however, the Full Commission finds that the medical evidence is insufficient to support such a finding.
24. No doctor definitively opined that plaintiff's cervical problems were caused by her low back strain or were otherwise caused by the December 20, 2002, work injury. As a consequence, the Full Commission finds there to be no causal relationship between plaintiff's compensable injury and her cervical problems.
25. In her deposition testimony, Dr. Gowin acknowledged that other triggers such as stress or depression could cause a flare-up of fibromyalgia. Dr. Gowin opined that plaintiff's fibromyalgia was aggravated by her work injury, and remains aggravated by the injury. Dr. Gowin further testified that plaintiff's compensable injury aggravated her low back condition. Dr. Gowin also opined that plaintiff would not have been able to perform her former job with defendant-employer between April 1, 2003, and October 27, 2004, the last date that Dr. Gowin examined plaintiff. Dr. Gowen thought it was unlikely that plaintiff's fibromyalgia would improve significantly and that she did not expect plaintiff to be able to return to employment.
26. With regard to plaintiff's depression, Dr. Gowin testified that it was hard for her to say whether plaintiff's pre-existing depression was aggravated by the pain resulting from her fall at work since she was not treating plaintiff for depression and did not specifically ask plaintiff about it.
27. In his deposition testimony, Dr. Viar opined that plaintiff's compensable injury did aggravate her low back condition, fibromyalgia and depression. In his opinion, plaintiff was unable to perform her job with defendant-employer without aggravating her low back condition and believed that plaintiff was totally disabled, and unable to ever do physical work again.
28. Only Dr. Viar opined that plaintiff's chronic pain from her compensable injury would have caused her depression; however, he is an osteopathic physician, and not qualified as an expert in psychiatry or psychology. Therefore, the Full Commission gives little weight to his opinion regarding any possible connection between plaintiff's depression and her compensable injury.
29. In his deposition testimony, Dr. Moody opined that plaintiff's compensable injury caused or aggravated her low back condition. Further, he opined that she was medically justified in not working during the time that she was under his care. Dr. Moody did not believe that plaintiff was at maximum medical improvement. He believed that participation in a functional restoration program would improve plaintiff's ability to function and lessen her disability and was hopeful that she would be able to return to work as a nurse.
30. Based on the greater weight of the competent evidence, the Full Commission finds that plaintiff's compensable injury of December 20, 2002, aggravated or exacerbated her low back condition and fibromyalgia. The Full Commission further finds that there is insufficient medical evidence to support a finding that plaintiff's depression and her cervical condition are causally related to her compensable injury.
31. The Full Commission finds that treatment received by plaintiff after December 20, 2002, for her low back and fibromyalgia was reasonably necessary to effect a cure, provide relief or lessen the period of disability.
32. The Full Commission further finds that plaintiff's termination on March 6, 2003, was related to her compensable injury in that she was still in significant pain and on numerous medications in the days leading up to the termination. Thus, plaintiff did not constructively refuse suitable employment.
33. Plaintiff had not reached maximum medical improvement for her compensable injury in February 2003, or May 2003.
34. As a result of her compensable injury on December 20, 2002, the Full Commission finds that plaintiff was totally disabled from employment from April 1, 2003, the date Dr. Godwin examined plaintiff and found her unable to return to work.
35. Defendants did not defend this matter unreasonably, as legitimate legal issues existed that deserved resolution.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On December 20, 2002, plaintiff sustained an injury by accident to her lower back as a result of a specific traumatic incident of the work assigned, arising out of and in the course and scope of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. The aggravation or exacerbation of plaintiff's low back condition and fibromyalgia was a direct and natural result of the compensable injury of December 20, 2002. Young v. HickoryBusiness Furniture, 353 N.C. 227 (2000).
3. As a result of her compensable injury by accident, plaintiff is entitled to temporary total disability benefits at the compensation rate of $304.68 per week from April 1, 2003, and continuing until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
4. As a result of her compensable injury by accident, plaintiff has incurred and continues to incur expenses for medical treatment that is necessary to effect a cure, provide relief and lessen her period of disability. Specifically, defendants shall pay for causally related care by Drs. Viar, Gowin, Moody and Haworth, and such other related care as may be directed by them. N.C. Gen. Stat. §§ 97-2(19), 97-25.
5. Defendants have not defended this case in violation of N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the award of attorney's fees approved herein, defendants shall pay to plaintiff temporary total disability compensation at the rate of $304.68 per week beginning April 1, 2003, and continuing until further Order of the Industrial Commission. Compensation due which has accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fees hereinafter approved.
2. Defendants shall pay expenses for plaintiff's medical treatment, incurred and to be incurred that are related to plaintiff's injury by accident of December 20, 2002. Specifically, defendants shall pay for causally related care by Drs. Viar, Gowin, Moody and Haworth, and such other related care directed by them.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff under paragraph one of this Award is approved for plaintiff's counsel and shall be deducted from sums due plaintiff and paid directly to plaintiff's counsel. Of any amount that has accrued, twenty-five percent of the lump sum due plaintiff shall be deducted and paid directly to plaintiff's counsel. Plaintiff's present counsel shall confer with plaintiff's former counsel regarding the apportionment of the attorney fee.
4. Defendants shall pay the costs of this matter. This shall include an expert witness fee of $450.00 to Dr. Moody.
This the __ day of July 2006.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER